WILLIAM R. CAHOON *vs.* JOHN G. MIERS.

*Notice by Recording—Legal presumption—Chattel Mortgage
—Mortgage of Domestic animals—Title to Increase.*

Under the statute law of this State, where a chattel mortgage has
been duly sworn to and recorded, it has the same effect in trans-
ferring the title, even though the mortgagor may remain in posses-
sion, as if the mortgagee had been put in possession of the mort-
gaged property ; and the law presumes notice of it and of its legal
effect, and all persons dealing with the mortgagor with respect to
such property, whether as purchasers or creditors, are affected with
such notice.

Under a mortgage of domestic animals, the title to their young or in-
crease is in the mortgagee.

APPEAL from the Circuit Court for Kent County.

Replevin for "seven large shoats." The facts of the
case are these: One Pennington who was tenant of a farm,
executed on the 19th of January, 1877, to his landlord,
Miers, a chattel mortgage including, among other perso-
nal property, "fifteen shoats" to secure the payment of
$967 with interest on the 19th of January, 1879. The
mortgage was *duly recorded,* and the mortgagor remained
in possession of the property and continued tenant of the
farm, but never paid the mortgage debt or any part of it.
In April, 1886, Cahoon, recovered judgment against Pen-
nington for $111.15, and shortly thereafter issued execu-
tion thereon. The sheriff levied this execution, among
other things, upon the hogs in controversy, which he
found upon the farm. At and before the sale, Miers gave
notice to the sheriff and the bidders that he claimed these
hogs under his mortgage, as the *increase* of the shoats
mentioned therein. And that they were such increase,
though not immediate, is conceded. The proof is that the

sow pigs embraced in the mortgage, littered in 1878, and that Pennington kept some of his sows two and some three or four years. Four of the hogs levied on were fourteen, and three eleven months old, and all were too old to be following the sows for nurture. It thus appears that these hogs must have been littered long after *default* had been made in payment of the mortgage debt, and were not the *immediate* increase of the original mortgaged stock. Notwithstanding the notice given by Miers, the sheriff proceeded to sell them "subject to all prior claims," and made a special return thereof. The judgment creditor, Cahoon, became the purchaser, and relying upon the title thus acquired replevied the hogs from Miers the mortgagee.

The case was tried upon issues joined on the pleas of *non cepit*, property in defendant and property in a stranger. At the trial the plaintiff asked four instructions to the effect that his title was good, and he was entitled to recover, 1st, because the hogs were not the *immediate* increase of any of those embraced in the mortgage. 2nd, because the defendant had permitted Pennington to retain the possession, use, and consumption of the original fifteen shoats and their increase. 3rd, that he was entitled to recover, if the jury find that these hogs, were the increase of the immediate offspring of the fifteen shoats, which immediate offspring was littered in 1878, *before default* in the mortgage. 4th, that the burden is upon the defendant to show that the hogs in controversy are the increase of said fifteen shoats or of their increase, or of their increase *after default* in the mortgage. The Court rejected all these prayers, and sustained the mortgagee's title. The verdict and judgment were in favor of the defendant and the plaintiff brings this appeal.

The cause was argued for the appellant before ALVEY, C. J., YELLOTT, STONE, MILLER, IRVING, and BRYAN, J., and submitted for the appellee.

Cahoon *vs.* Miers.

*Hope H. Barroll,* and * *James P. Gorter,* for the appellant.

The Court below erred in rejecting the plaintiff's prayers, because, if the hogs in controversy were the increase of the litter of 1878, they would not pass under the mortgage to the said John G. Miers, and the said John G. Miers would have no title to the same—it not being possible for any of the sow shoats covered by the said mortgage to have been with pigs, at the date thereof, and to have given birth thereto in 1878.    And the said litter of 1878 would belong to the mortgagor, having been born before the maturity of the mortgage.    *Darling vs. Wilson,* 60 *N. H.,* 59 ; *Winter vs. Landphere,* 42 *Iowa,* 471 ; *Thorpe vs. Cowles,* 55 *Iowa,* 408.    See also *Jones on Chattel Mortgages, sec.* 149.

Even though, as between mortgagor and mortgagee, the title to the increase may be in the mortgagee, yet as to an attaching creditor who, when he deals with the mortgagor, contracts a debt with him, seeing him in possession of property, using and dealing with it as his own, and in regard to which the said creditor has no notice—either constructive, said property not being described in the mortgage given by the mortgagor—or actual, that it belonged to a third person—such increase cannot pass under the mortgage so as to defeat his claim.

*Richard Hynson,* for the appellee.

The plaintiff's prayers were properly rejected.    *Herman on Executions,* 337, 338, 339, (*n.* 2 *and* 3,) 340.

A mortgage is treated at law, both before and after forfeiture, as vesting the legal estate in the mortgagee, and the right of possession follows as a consequence.    *Jamieson vs. Bruce,* 6 *G. & J.,* 74 ; *Brown vs. Stewart,* 1 *Md. Ch. Dec.,* 92.    And it is not necessary that the increase should be mentioned in order to pass title to the mortgagee.    *Evans & Iglehart vs. Merriken,* 8 *G. & J.,* 39.    See *Leigh-*

* Mr. Gorter, although present, took no part in the argument.

*ton vs. Preston & Hepburn,* 9 *Gill,* 201 *and* 203 ; *Conard vs. Atlantic Ins. Co.,* 1 *Pet. Rep.,* 441 ; 2 *Black. Com.,* 404 ; 4 *Md.,* 538.

Under the rule that the incident follows the principal, the mortgage of domestic animals covers their increase. *Evans & Iglehart vs. Merriken,* 8 *G. & J.,* 39 ; *Fields vs. Beeler,* 3 *Bibb,* 18 ; *Hughes vs. Graves,* 1 *Litt.,* 317 ; 1 *B. Mon., (Ky.,)* 124 ; *Jones on Chattel Mortgages, &c.,* 49.

The increase of a pledge belongs to the pledgee. *Story on Bail.,* 200. And the right of a mortgagee is superior to that of a pledgee. 2 *New Hamp.,* 13.

The appellee having the legal title to the hogs in question, the mortgagor's equitable interest could not be seized and sold under a *fieri facias. Harris & Chauncy vs. Alcock,* 10 *G. & J.,* 251 ; *Rose & Gauss vs. Bevans, et al.,* 10 *Md.,* 470 ; *Jenkins vs. McIlroy,* 42 *Ark.,* 236.

The hogs replevied were littered subsequent to the forfeiture of the mortgage, therefore the appellee's title became absolute and indefeasible at law. *Evans & Iglehart vs. Merriken,* 8 *G. & J.,* 39.

MILLER, J., delivered the opinion of the Court.

Authorities are to be found in other States to the effect that a mortgage of domestic animals which makes no mention of the increase, covers the increase, even as between the parties, so long only as it is necessary for the young to follow the mother for nurture ; or at all events that a purchaser of such increase from the mortgagor who is left in possession thereof, without actual notice of the mortgagee's claim, will acquire a good title ; and in one case the same thing was held in regard to the title of an attaching creditor. *Jones on Chattel Mortgages, secs.* 149, 150 ; *Winter vs. Landphere,* 42 *Iowa,* 471 ; *Darling vs. Wilson,* 60 *N. H.,* 59.

But the law has long been settled differently in this State. In the case of *Evans & Iglehart vs. Merriken,* 8

*G. & J.*, 39, (decided in 1836,) there was a mortgage of several female negro slaves in which nothing was said as to their issue or increase. One of them had a child born after default in payment of the mortgage debt, and while the mother was in possession of the mortgagor. When this child was about two years old the mortgagor sold it to his son for a valuable consideration, who thus became a *bona fide* purchaser for value, and immediately took possession of the child and raised it, with the knowledge of the mortgagees and without any claim of title on their part. Eleven years after the date of the mortgage the mortgagees filed their bill for the sale of the mortgaged property, and the trustee appointed to make the sale sold the child with its mother. The question then arose whether the proceeds of sale of the child should go to the mortgagees towards payment of the mortgage debt, or to the purchaser from the mortgagor. The Chancellor's decision was in favor of the purchaser, but this was reversed by the Court of Appeals. The question was conceded to be a new one, was argued before a very full Court, all the Judges but one being present, and they gave it a very careful consideration. In behalf of the appellee, the argument was pressed that the mortgage having made no mention of the issue, the public had no means of knowing where the title was, and they should be secured in dealing with the possessor as the legal proprietor; that when the boy was conveyed to him by the mortgagor, the appellee who was an innocent third party and a purchaser for value, did not, and could not know that he was touched by the mortgage. But the Court putting aside this argument, rested their decision upon the legal effect and operation of the mortgage, as between mortgagor and mortgagee. They said, and upon ample authority, that a mortgage does something more than merely create a lien for the debt; that upon its execution the *legal estate*, becomes immediately vested in the mortgagee, and the right of possession fol-

lows as a consequence, subject only to the occupancy of the mortgagor, which is only tacitly permitted until the will of the mortgagee is determined ; that this legal estate is defeasible at law upon the payment of the mortgage debt at the time stipulated, but if this is not done then it becomes indefeasible at law and defeasible only in equity, where the mortgagor, nothwithstanding his default, is permitted to redeem. From this view of the nature and effect of a mortgage, they say, it results that the mortgagee must be considered as having an *estate* or *interest* in the *subject-matter* of the mortgage, not absolute, it is true, because such an estate is not imported by the terms of the instrument, but an interest commensurate with the object contemplated to be attained by it, as a security for the payment of the debt. They then applied the rule that the owner of the mother is the owner of her offspring, and held that the mortgage covered the issue. For authority they referred to the case of *Hughes vs. Graham,* 1 *Litt.,* 317, where the same question arose, and where the same decision in regard to the offspring was made. They said that in the case before them the title of the mortgagee had become absolute at law, when the issue was born, and therefore his title to the mother being absolute and indefeasible at law, he must, of course, be entitled *at law* to her offspring, subject to the equitable right of the mortgagor to redeem in equity on payment of the mortgage debt. In further support of their view they refer to the analogous rule in case of a *pledge,* and cite from *Story on Bailments, sec.* 292, where it is said, "by the pledge of a thing, not only the thing itself, but also as accessory the *natural increase* thereof,—as if a flock of sheep are pledged the young afterwards born are also pledged;" and from this they argue, that if such is the principle in the case of a *pledge,* where only a special property passes, *a fortiori* ought the rule to obtain in the case of a *mortgage,* where the *whole legal title* passes con-

ditionally to the mortgagee, and more especially where by forfeiture the title has become absolute at law.

By the reference thus made to the law of pledges, the Court unquestionably adopted the rule of the civil law on that subject, and placed a duly sworn to and *recorded mortgage* of personal property, upon the same footing in regard to its covering the increase of the property mortgaged. The whole tenor and course of their reasoning is to this effect. The citation they make from *Story on Bailments* is founded on the civil law, and in the same section from which they cite, the extent to which the doctrine is carried by the Roman law is thus stated: "*Grege pignori obligato, quæ postea nascuntur, tenentur. Sed et si capitibus decedentibus totus grex fuerit renovatus, pignori tenebitur.*"

So also *Domat* in giving us the Civil Law doctrine as to mortgages and powers, and the privileges of creditors thereunder says: "Although the mortgage be restricted to certain things, yet it will nevertheless extend to all that *shall arise or proceed* from that thing which is mortgaged, or that shall augment it or make part of it. Thus when a stud of horses, a herd of cattle, or a flock of sheep is put in pawn into the creditor's hands, the foals, the lambs and other beasts which they bring forth, and which augment their number, are likewise engaged for the creditor's security. And if the whole herd or flock be entirely changed, the heads which have renewed it are engaged in the same manner as the old stock." *Domat's Civil Law by Strahan, sec.* 1663.

By our statute law where the mortgage has been duly sworn to and recorded, (as is the case here) it has the same effect in transferring the title, even though the mortgagor may remain in possession, as if the mortgagee had been put in possession of the mortgaged property. *Code, Art.* 24, *secs.* 29 *and* 39. When thus sworn to and recorded, the law presumes notice of it and of its legal effect, and all persons dealing with the mortgagor with respect

to such property, whether as purchasers or creditors are affected with such notice. Unquestionably a judgment creditor of the mortgagor may levy upon the mortgaged property and then file a bill in equity to redeem, and thus secure for his claim what may remain of the proceeds of sale after satisfying the debt due the mortgagee. But at law, the *title* all the while is in the mortgagee, and this being an action at law involving simply the legal title, we are constrained to hold, under the decision referred to, that the title to the hogs in controversy was in the mortgagee. That decision has been acquiesced in and recognized as the law of the State for more than half a century, and we see no good reason for overruling it now.

*Judgment affirmed.*

(Decided 3rd November, 1887.)